**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  16 CR 425** |
| | ) | |
| **JEFFREY BATIO,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

For more than twelve years, Jeffrey Batio lured investors into funding his computer-products businesses with false assurances that cutting-edge products were ready to hit the market.  In fact, no products were ever ready for commercial production, and he used much of the funds he collected for personal expenses.  Mr. Batio was convicted by a jury on six counts of mail fraud and six counts of wire fraud.  He now moves for a judgment of acquittal or a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, respectively.  In support of his motion, Mr. Batio argues that the evidence at trial was insufficient to convict him, that he was deprived of his constitutional rights to due process and a fair trial under the Fifth and Sixth Amendments, that there was significant prosecutorial misconduct, and that his prior counsel was ineffective.  For the reasons discussed below, Mr. Batio's motion is denied.

## BACKGROUND

At times relevant to the superseding indictment, Mr. Batio was the Chief Executive Officer of two companies, Armada Systems LLC ("Armada") and Ideal Future, Inc. ("Ideal Future").  These companies were purportedly in the business of creating and selling innovative computer products, two of which are central to this case.  The first product, the Radian, featured multiple monitors that could be attached to a desktop computer.  The second product—known first as the Stealth, then the IF Convertible, and eventually the Dragonfly Futurefon ("Dragonfly")—was a folding

1

laptop computer that could also be used as a tablet and as a smartphone. To raise money for Armada, Mr. Batio sold membership shares to investors. For Ideal Future, he used the crowdfunding website Indiegogo.com ("Indiegogo"), where customers submitted pre-orders for the IF Convertible and the Dragonfly, as well as various accessories and upgrades. Between approximately 2003 and 2016, Mr. Batio repeatedly represented that his products were ready for market, but in fact, they were nowhere near completion. The Government charged that this pattern of misrepresentations constituted a fraudulent scheme that deprived victims of over $5 million. (*See* Govt's Sur-Reply [303], 1–9.)

Mr. Batio was indicted in June 2016 and tried in May of 2019. At the close of the Government's case, he moved for a judgment of acquittal. (Def.'s Mot. Acquittal [212].) The court reserved decision on the motion and proceeded to hear the defense case per Rule 29(b).[1] Mr. Batio was convicted on May 31, 2019, and he filed a supplemental motion for acquittal or a new trial on July 1, 2019. (Def.'s Post-Trial Suppl. Mot. [221].) Since then, he has retained new counsel, and he now offers additional arguments in support of his original motion. (Def.'s Reply to Govt.'s Consolidated Response [300] (hereinafter "Def.'s Reply").)

## LEGAL STANDARDS

### A.    Rule 29

Rule 29(a) provides that if a defendant moves for acquittal at the end of the government's case-in-chief or at the close of all the evidence, the trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In ruling on such a motion, the court views the evidence "in the light most favorable to the government, and [ ] will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir.

---

[1]    *See* Tr. 1499:24–1500:3 (The Court: "I did see also on the docket that Ms. Gambino has filed a motion for a judgment of acquittal. And I will enter and continue that motion and give the government an opportunity to respond, but I don't want to keep the jurors waiting because it might take a little while for us to do that.").

2020) (quoting *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016)). The court will not re-weigh the evidence or second-guess the jury's determinations regarding the credibility of witnesses. *Ginsberg*, 971 F.3d at 695 (citing *United States v. Cardena*, 842 F.3d 959, 994 (7th Cir. 2016)).

A defendant challenging the sufficiency of the evidence faces a "nearly insurmountable hurdle." *See, e.g.*, *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (collecting cases). But "the height of the hurdle depends directly on the strength of the government's evidence." *Garcia*, 919 F.3d at 496–97 (quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013)). Bearing in mind that the burden of proof is much higher in criminal trials than civil trials, "If the evidence would not allow a civil case to survive a motion for summary judgment or a directed verdict, then the case has no business being given to a jury in a criminal trial." *Garcia*, 919 F.3d at 491. In other words, if the government has not proven the defendant's guilt by a preponderance of the evidence, then no rational jury could have convicted the defendant under the much tougher beyond-a-reasonable-doubt standard.

**B.** **Rule 33**

Under Rule 33, a court may, upon defendant's motion, vacate a conviction and grant a new trial "if the interest of justice so requires." Such a motion should be granted if "the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (citation omitted), *rev'd on other grounds*, 546 U.S. 12 (2005). A new trial is appropriate, however, "only if the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. O'Brien*, 953 F.3d 449, 456 (7th Cir. 2020) (citing *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007)).

## DISCUSSION

### A.     Timeliness

As a threshold matter, the court rejects the Government's argument that Mr. Batio's post-trial motion for acquittal or a new trial was untimely.  (*See* Govt.'s Consolidated Response [227] at 2–3.)  Under Rule 29(c)(1), a post-trial motion for acquittal must be filed 14 days after the verdict or discharge of the jury.  Similarly, under Rule 33(b)(2), motions for a new trial are due 14 days after the verdict.  The court may, however, grant additional time for good cause on a party's motion. *See* FED. R. CRIM. P. 45(b)(1).

After the jury's verdict and discharge on May 31, 2019, Mr. Batio's trial counsel requested 30 days to submit post-trial motions, and the court granted that request on the record.[2]  That ruling was unfortunately not reflected in a docket entry, but the court concludes that Mr. Batio had until July 1, 2019—exactly 30 days after the verdict—to submit a supplemental motion for acquittal and, in the alternative, a new trial.  *See* FED. R. CRIM. P. 45(a)(1).  Defense counsel did so, rendering Mr. Batio's motion timely.

### B.     Sufficiency of the Evidence

To establish that Mr. Batio committed mail fraud under 18 U.S.C. § 1341, the Government was required to prove beyond a reasonable doubt: (1) that the defendant knowingly devised or participated in a scheme to defraud as described in the indictment; (2) that the defendant did so with the intent to defraud; (3) that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and (4) that for the purpose of carrying out the scheme or attempting to do so, the defendant used or caused the use of the United States mails in the manner charged in the particular count.  (*See* Tr. 1583:13–1584:2 (instructing the jury).)  The elements of wire fraud under 18 U.S.C. § 1343 are largely the same; to support a conviction of

---

[2]     *See* Tr. 1702:5–8 (The Court: "The ordinary schedule for post-trial motions?"  Ms. Gambino: "Your Honor, if we could extend it by 30 days."  The Court: "Sure.").

wire fraud, the Government had to prove beyond a reasonable doubt: (1) that the defendant knowingly devised or participated in a scheme to defraud as described in the indictment; (2) that the defendant did so with the intent to defraud; (3) that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and (4) that for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place in the manner charged in the particular count. (*See* Tr. 1584:12–1585:1 (instructing the jury).) *See also United States v. McClellan*, 794 F.3d 743, 751–52 (7th Cir. 2015) (collecting cases on mail fraud elements); *United States v. Kelerchian*, 937 F.3d 895, 908–909 (7th Cir. 2019) (collecting cases on wire fraud elements).[3]

Mr. Batio argues that the Government's evidence was insufficient to convict him. Specifically, he contends that the Government's evidence did not show that he devised a scheme to defraud, that he had the requisite intent to defraud investors, or that his statements were materially false or fraudulent. (Def.'s Reply at 3–15.) In other words, Mr. Batio challenges the sufficiency of the evidence with respect to elements one, two, and three of §§ 1341 and 1343. He does not dispute that he used or caused the use of the mails or interstate wires in the manner described in the indictment. (*See generally* Superseding Indictment [93].)

**1. Scheme to Defraud and Intent to Defraud**

Following Seventh Circuit Pattern Jury Instructions, § 6.10 (2012 ed.), the court instructed the jury that "[a] scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another by a means of materially false or fraudulent pretenses, representations, or promises." (Tr. 1585:13–17.) A defendant acting in "good faith" lacks the intent to defraud "if at the time he honestly believed the truthfulness and validity of the representations and promises that the government

---

[3] Furthermore, "the elements of wire fraud under 18 U.S.C. § 1343 directly parallel those of the mail fraud statute so that cases construing one are equally applicable to the other." *Kelerchian*, 937 F.3d at 909 n.2 (citation and quotation marks omitted).

has charged as being false or fraudulent as described in the portion of the indictment setting forth the scheme." (Tr. 1586:16–21.). But "[a] defendant's honest and genuine belief that he will be able to perform what he promised is not a defense to fraud if the defendant also . . . knowingly made false and fraudulent representations."[4] (Tr. 1587:1–4.) Notably, "[i]ntent to defraud may be established by circumstantial evidence." *McClellan*, 794 F.3d at 752 (citation and quotation marks omitted).

Mr. Batio argues that his statements were "based on the information that [he] had at a point in time, which information did at times later prove to be inaccurate or overly optimistic, but not deliberately false." (Def.'s Reply at 4.) He notes that the information provided in the Private Offering Memoranda ("POM") to Armada investors and the Indiegogo terms of use gave warnings about the risks of investing in a startup. (Def.'s Reply at 5.) Mr. Batio disputes the Government's assertion that he was never able to bring a product to market; he contends that the Voyager, a folding laptop computer, might have been completed in 2003, had his foreign manufacturing contractor not run into financial difficulties. (Def.'s Reply at 7.) He also contends that the failure of the Radian, a dual-screen monitor, was due to circumstances outside his control—namely, the 2008 economic recession—an argument that he made numerous times at trial. (Def.'s Reply at 9.) Similarly, he contends that his legitimate efforts to bring the Dragonfly to market were unfairly thwarted by the Government's indictment of him in June of 2016. (Def.'s Reply at 14.)

Viewing the evidence in the light most favorable to the Government, however, the court concludes that there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that Mr. Batio schemed to defraud Armada investors and Indiegogo contributors. First, the Government presented abundant evidence that Mr. Batio lied to investors about the market-readiness of his products. For example, the 2006 Armada POM projected revenues of $40 million over a one-year period, but the Radian was not yet ready for

---

[4] The court gave this instruction over defense counsel's objection. (*See* Tr. 1413:3–23.)

6

manufacturing, much less for sale to consumers.  (*See* Tr. 874:9–22 (Gregory Cazel direct examination).)  Investors cannot adequately assess the risks of investing when some of the information upon which they are relying is not merely overly optimistic but false.  And written warnings about the risks of investing do not excuse fraudulent misrepresentations to investors. Written non-reliance clauses may preclude claims of fraud in some civil cases, but such clauses do not always defeat criminal fraud charges.  *Compare Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) (civil fraud), *with United States v. Ghilarducci*, 480 F.3d 542, 546–47 (7th Cir. 2007) (criminal fraud).  In *Ghilarducci,* the court concluded that there was sufficient evidence to convict the defendant of wire fraud and other crimes despite contracts purporting to place victims on notice that no oral representations would be honored.  480 F.3d at 546–47.  Similarly, in *United States v. Garten*, 777 F.3d 392 (7th Cir. 2015), the defendant told timeshare owners that fine print in a contract did not apply to them but later pointed to the same language to justify a nonrefundable fee.  777 F.3d at 395–96.  The court held that there was sufficient evidence of conspiracy to commit mail and wire fraud, notwithstanding the language in the contract.  *Id.* at 400.

Second, the Voyager's success, or lack thereof, is ultimately unnecessary to the counts in the indictment, which concern statements Mr. Batio made regarding his later products: the Radian and the Dragonfly (a combination cell phone, tablet, and laptop), previously known as the Stealth and the IF Convertible.  His argument that the 2008 recession explains the failure of the Radian does not make chronological sense: Mikal Greaves stopped working as a consultant for Armada in May of 2008 because he had not been paid, and Matthew Vanderzee left the company in July of 2008 for the same reason—but the market did not crash until September of 2008.[5]  A rational

---

[5]    *See* Tr. 938:6–940:6 (Mikal Greaves direct examination) (explaining that there was "nobody else to do any of the work" on the Radian pilot run after he left in May of 2008); Tr. 529:7–10 (Matthew Vanderzee direct examination); Tr. 287:18–288:3 (Andrea Berrett direct examination) (testifying that she invested approximately one week before the stock market crashed).

jury could have concluded that the Radian failed not because of the recession, but because Mr. Batio was nowhere near completion of the product's engineering and had already run out of money by the summer of 2008.

Despite these circumstances, Mr. Batio continued to tell investors that the Radian's launch was imminent between 2009 and 2012, even though Armada had no other employees and was not making significant progress on the Radian's design.[6]  Those statements could have induced investors like Gregory Cazel, Daniel Leo-Toulouse, David Schultz, and Susan Sklade to invest not once but multiple times.  *See* Superseding Indictment, Counts I–VII.  Later, Mr. Batio continued making misleading statements to Indiegogo contributors that conceivably induced hundreds of people to support the Dragonfly's crowdfunding campaign.  *See* Superseding Indictment, Counts VIII–XII.  For example, Mr. Batio told Indiegogo contributors in an August 2015 update that "we will begin shipments [of the Dragonfly] by the end of the year."  (Tr. 812:6–17 (Edward Nickow direct examination).)  In fact, at that time, two companies he had hired to conduct feasibility studies, Fidus and Finn Sourcing, had determined that such a timeline was unrealistic.[7]

---

[6]     *See, e.g.*, Tr. 272:4–273:24 (Andrew Martin direct examination) (Armada Update, Dec. 9 2009 stated: "we began 2009 with a concerted effort to explore licensing and partnering opportunities" and "we are currently in discussions to co-market the Radian with Sony"); Tr. 876:12–879:8 (Gregory Cazel direct examination) (Armada Update, July 24, 2012 stated: "The Radian engineering is complete and is effectively ready to get into production.").

Mr. Batio also told investors that a web-based software product known as Virtoro was ready for market. (Armada Update, Dec. 9, 2009 stated: "we have created a unique software product that we will be introducing to market in Q1, 2010" and Virtoro "is now ready for market"). Mr. Vanderzee's testified, however, that it was merely a prototype at the time he left Armada in 2008. (*See* Tr. 498:25–500:12 (Matthew Vanderzee direct examination). Mr. Vanderzee was the only Armada employee with software experience, and he estimated that, from the time he left, it would have taken a team of 15 to 20 engineers six months to finalize the product. (*Id.* 488:25–489:11, 493:20–498:11.).  Indeed, in 2011, Mr. Batio asked Mr. Vanderzee—then no longer an employee—for a summary of "what needs to be done to complete the [Virtoro] site in order to launch," confirming that the product could not have been "ready for market" at the time of the December 2009 update.  (Tr. 496:14–15.)

[7]     *See* Tr. 982:1–986:9 (Vicki Irene Coughey direct examination) (testifying that Fidus estimated it would take at least two years from March 2015 to bring the Dragonfly to market); Tr. 623:16–624:25 (Gloria Maceiko direct examination) (testifying that Finn Sourcing determined it would be impossible to produce the Dragonfly with a dual-operating-system laptop by the end of 2015).

A rational jury could infer from this evidence that Mr. Batio made materially false statements to deceive and obtain money from investors.  *See McClellan*, 794 F.3d at 752.

Mr. Batio assured investors that the money he solicited was used to develop his products. In fact, the timing of numerous cash withdrawals immediately following his fundraising pleas reasonably support a finding that he used investor funds to address personal financial difficulties, rather than to improve his products.  For example, the Government's expert Jose Javier Ruiz testified that, of the $33,500 that Mr. Batio raised for Armada in December of 2011, $18,675 was transferred to his personal account—the existing balance of which was just $146 at the time. (Tr. 1272:11–1273:14.)  Mr. Ruiz also testified that, in April of 2013, some of Mr. Batio's Quickbook entries were revised as loans to himself rather than expenses for his ex-wife.  (Tr. 1259:20–1262:13.)  By October of that year, the FBI was investigating Mr. Batio; the jury could have inferred that even before he was aware of that investigation, Mr. Batio recognized the impropriety of using investor funds for personal expenses and attempted to cover his tracks by recategorizing the withdrawals as loans.  (*See* Tr. 1097:16–1098:21 (stipulating that an FBI Special Agent interviewed Mr. Batio on October 23, 2013 about his work for Armada and Ideal Future).)  Similarly, Mr. Batio's failure to send investors Schedule K-1s (so that they could count their investments as losses for tax purposes) suggests not only that he was not keeping complete financial records, but also that such records could have revealed comingling of company funds.[8] Investor John Sims, who volunteered to gather information for Armada's financial statements, testified that he repeatedly asked Mr. Batio for Armada's 2010 financial records, but when Mr. Batio finally sent him Armada financial statements for 2008, there were no supporting documents.

---

[8]     *See, e.g.*, Tr. 242:1–24 (Cartic Vengkatrama direct examination) (testifying that he never received K-1s); Tr. 788:7–19 (Daniel Leo-Toulouse direct examination) (testifying that he did not get a K-1 after his first Armada investment in December 2004, and only received one for "the last two years [in 2011 and 2012] because we pushed so hard").

(Tr. 1125:19–1130:14.)  Furthermore, Mr. Batio never responded to Mr. Sims's request for the name and contact information of Armada's accountant.  (Tr. 1164:8–14.)

Mr. Batio has consistently maintained that he used investor funds predominantly for business expenses and that there is nothing wrong with using some of the money he raised to support himself.  (Def.'s Reply at 9, 15.)  The court agrees that use of investor funds to pay Mr. Batio a salary would not by itself be improper; but that practice would also not excuse false statements.  In support of his argument, defense counsel inaccurately characterizes a conversation out of the jury's hearing as reflecting a "holding" by this court that "the payment of rent is indicative of a legitimate business expense."[9]  (Def.'s Reply at 9 n.9.)  The court's remark was taken entirely out of context from a discussion about the admissibility of testimony from Defendant's proposed expert, Ronald Braver; it does not constitute a holding that Mr. Batio's financial activities were lawful.  Elsewhere in his reply brief, defense counsel also inaccurately characterizes the court's statement that "You could say, there is nothing improper about Mr. Batio having paid himself," as "holding" that his method of compensating himself was lawful.  (Def.'s Reply at 15 (quoting Tr. 1452:13–14).)  To the contrary, this comment was part of a discussion with Ms. Gambino about how Mr. Braver might reframe his testimony in a way that did not require him to present conclusions that were unsupported by admissible evidence.

A rational jury could also have been persuaded by witness Art Villa, who testified that Mr. Batio asked him to cut a hole in a tabletop so that a prototype of the Dragonfly, to be presented in a promotional video for Indiegogo, would appear thinner than it actually was.  (Tr. 414:9–417:2.)  Renderings of the Dragonfly on Indiegogo purported to show that the device would be as thin as a dime when folded (*see* Tr. 123:5–14 (Tschiltsch direct examination)), but the hole in the tabletop concealed about an inch of thickness.  (Tr. 431:2–23 (Villa direct examination).)  A reasonable

---

[9]     The Court said: "Now, we don't know for sure what was happening with it, but it's only reasonable to conclude that if you spend that kind of money on commercial rent, that part of that is business. Ordinary people don't spend a huge amount on a commercial property unless they are in business with it."  Tr. 1448:18–1449:1.

jury could conclude that this effort to mislead viewers about the actual dimensions of the prototype was deceitful and fraudulent, in that it misrepresented Mr. Batio's progress in designing the device.

Mr. Villa's testimony suggests that the promotional video was deceptive in other ways, as well: the video was filmed at Mr. Villa's own company's facility (not an Armada facility) in October of 2015; and Bridget Hogan, who handled marketing for Ideal Future and acted as a model in the video, used a plastic enclosure designed to look like the purported Dragonfly Futurefon, but the product in fact had no calling or texting capabilities at the time. (Tr. 417:4–427:2; Tr. 431:12–439:25.) The parties disagree over the proper terminology for this prototype (*see, e.g.*, Def.'s Reply at 26–27), and Mr. Batio contends that contributors should not have believed that they were purchasing a finished product when they paid for "perks" on Indiegogo. (*See* Tr. 77:2–22 (Thomas Morgan cross exam) (agreeing with defense counsel that "perks" are "items that may become available as rewards for participating in the campaign," including the Dragonfly, upgrades, and accessories) ).) But investors testified that they did indeed believe that the product shown on Indiegogo could actually work as advertised and that they would eventually receive a functional Dragonfly. (*See, e.g.*, Tr. 36:18–20 (Thomas Morgan direct examination) (testifying that, at the time he purchased four Dragonfly Futurefons in November 2014, he believed that the Dragonfly would be delivered in approximately eight to ten months); Tr. 100:2–3 (Jeffrey Tschiltsch direct examination) ("People backed a physical, tangible product if they picked the perks that had the product in it."); Tr. 175:17–20 (Michael Doyle direct examination) (testifying that he expected to get a real device with Windows and Android capabilities); Tr. 191:18–22 (Richard Sutherland direct examination) (testifying that, after investing in 2014, he believed the Dragonfly would be delivered in the summer of 2015).) At least one victim invested again after viewing the misleading October 2015 video. (*See* Tr. 86:6–89:16 (Thomas Morgan direct examination) (testifying that he watched the video and continued purchasing upgrades for the Dragonfly until November 2015).) Other contributors closely followed updates from the Indiegogo campaign, even if they did not

11

make additional payments.[10]  Accordingly, a reasonable jury could have found that Mr. Batio intended to deceive and defraud his victims.

### 2. Materiality

Mr. Batio further argues that his statements to investors were not "intentionally materially misleading" because "it is not possible for updates [he] provided after the fact to influence a prior decision [to invest] retroactively."  (Def.'s Reply at 16.)  He contends that his updates "were only provided to *pre-existing* Armada and Indiegogo contributors, and *only* after they had *already* invested or contributed their money," and therefore such updates could not have been materially misleading.  (*Id.* (emphases in original).)  In other words, even if Mr. Batio made false assurances, the only people who received them had already invested.

As a factual matter, this argument is inaccurate.  Not all investors gave money again after Mr. Batio posted his updates, but some did, as discussed below.  As a legal matter, his argument lacks support under the law of this circuit, which is reflected in the jury instructions.  At trial, the jury was instructed as follows: "A false or fraudulent pretense, representation, promise, omission, or concealment is 'material' if it is *capable* of influencing the decision of the person to whom it was addressed.  It is not necessary that the false or fraudulent pretense, representation, promise, omission, or concealment actually have that influence or be relied on by the alleged victim as long as it is capable of doing so."[11]  (Tr. 1586:2–9); *see also* Pattern Criminal Jury Instructions of the Seventh Circuit (2012 ed.) at 431; *United States v. O'Brien*, 953 F.3d 449, 460 (7th Cir. 2020)

---

10    *See, e.g.*, Tr. 176:2–177:25 (Michael Doyle direct examination) (testifying that he viewed the October 2015 video after purchasing a Dragonfly in November 2014); Tr. 358:8–359:13 (Victor De LaCruz direct examination) (testifying that, after purchasing a Dragonfly and upgrades in late 2014, he continued to follow updates on Indiegogo, including the October 2015 video).

11    Mr. Batio's trial counsel objected to this instruction on the grounds that it "unfairly lifts the burden on the government" by telling the jury "what the government doesn't have to do," (Tr. 1373:15–18), but the court overruled the objection.  (*See* Tr. 1374:4–8 (noting that the instruction comes from the Seventh Circuit's pattern jury instructions for criminal trials).)

("Materiality requires only the tendency or capability of influencing the victim; there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations.") (citation omitted). Moreover, "The mail and wire fraud statutes can be violated whether or not there is any loss or damage to the victim of the crime or gain to the defendant."[12] (Tr. 1587:5–7); *see also* Pattern Criminal Jury Instructions of the Seventh Circuit (2012 ed.) at 440.

A rational jury could have found that Mr. Batio's statements were materially misleading because they were capable of influencing investors to give him money. The Government was not required to show that each alleged victim in fact relied upon Mr. Batio's misrepresentations. *See O'Brien*, 953 F.3d at 460. Instead, the Government presented evidence that many of Mr. Batio's communications to investors repeatedly misstated the degree of his progress on various products and were directly contradicted by the testimony of witnesses who had worked with him. For example, Mr. Batio's November 2008 update to Armada investors told them that the company was "ready for Radian production" and "actually beginning the process of building and shipping the first Radians" (Tr. 892:2–5). At that time, however, it had no manufacturing facility and no employees after the departure of Matthew Vanderzee in July of 2008.[13] Mr. Batio's December 2009 update boasted that Armada was in discussions with Sony to license the Radian and the Stealth. (Tr. 272:10-24.) But Andrew Martin, who then worked at Sony and agreed to test out the Radian, testified that his role had nothing to do with product development or licensing (Tr. 273:17–22), and that he found the product "kludgy . . . difficult to work with, and . . . less productive than if I hadn't had it at all." (Tr. 260:21–23.) In an email in September of 2011, Mr.

---

[12]      This instruction, too, was given over the defense's objection. (*See* Tr. 1375:18–24.)

[13]      *See* Tr. 890:5–20 (Gregory Cazel direct examination) (testifying that Mr. Batio did not inform him that Armada was evicted from the San Jose manufacturing facility in September or October of 2008); Tr. 495:9–10 (Matthew Vanderzee direct examination).

Batio told investor Gregory Cazel that the Radian could run both Windows and Android operating systems, despite the fact that he had not yet determined whether that would be feasible. (Tr. 862:8–863:22 (Gregory Cazel direct examination).) Viewed in the light most favorable to the Government, these statements were capable of influencing investors' willingness to invest again in Armada despite years of delays.[14]

Mr. Batio's posts on Indiegogo in October and November of 2014 included statements that, according to numerous witnesses, influenced their decision to "pre-order" a Dragonfly, accessories, and upgrades. (*See, e.g.*, Tr. 33:21–34:12 (Thomas Morgan direct examination).) But at the time he made those posts, Mr. Batio had not yet figured out how to design a dual Windows-Android operating system,[15] which many contributors testified was a key feature driving their interest in the product. (*See, e.g.*, Tr. 31:11–21 (Thomas Morgan direct examination); Tr. 822:15–22 (Tim Sledz direct examination).) And the Dragonfly's detachable "Slingshot" smartphone did not have the ability to make calls. (*See* Tr. 679:11–680:7 (Mitch Gebheim direct examination).) By the summer of 2016, Mr. Batio's manufacturing contractor, Benchmark, was not able to produce a working cell phone, and they had told Mr. Batio as much. (*See* Tr. 674:15–75:2 (Mitch Gebheim direct examination).)

Mr. Batio's reliance on *United States v. Bogucki*, No. 18-cr-21, 2019 WL 1024959 (N.D. Cal. 2018) (granting a Rule 29 motion for acquittal), is misplaced. (*See* Def.'s Reply at 17.) Not

---

[14]    *See, e.g.*, Tr. 287:11–296:17 (Andrea Berrett direct examination) (testifying that she first invested $30,000 in Armada in 2008, but that Mr. Batio persuaded her to invest another $1,000 in 2011); Tr. 367:2–368:2 (Susan Sklade direct examination) (testifying that she invested four times between 2006 and 2011); Tr. 774:11–782:25 (Daniel Leo-Toulouse direct examination) (testifying that he invested an additional $5,000 in 2011 on top of $65,000 worth of investments since 2004 because "He'd keep calling and say, hey, we're so close. We need this amount of money in order to launch this product.").

[15]    *See* Tr. 623:8–624:3 (Gloria Maceiko direct examination) (testifying that two operating systems for the Dragonfly "would not be feasible with the time frame and amount of funding that was available" and that a prototype of an Android-only device would not be available until December of 2015 at the earliest).

only is that decision merely persuasive authority, as it was decided by a district court in the Ninth Circuit, but it is also distinguishable on its facts. *Bogucki* involved charges that the defendant, a trader at an investment bank, committed wire fraud affecting a financial institution by deceiving them in an options trade. The defendant and the financial institution were sophisticated parties negotiating at arm's length with the knowledge that each side had incentives to bluff or posture. *Bogucki*, 2019 WL 1024959 at *2–3. The district court in *Bogucki* determined that none of the defendant's statements were material, in part because "standards generally applied in the lending industry at the time are relevant to the materiality inquiry." *Id.* at *3 (citation and internal quotation marks omitted).[16] By contrast, the investors in this case were not financial institutions conducting arm's-length negotiations. Many of the victims had never invested in a start-up before. (*See e.g.*, Tr. 313:12–18 (Andrea Berrett cross examination); Tr. 399:15–19 (Susan Sklade cross examination); Tr. 894:8–10 (Gregory Cazel cross examination).) These investors did not think that Mr. Batio was merely bluffing when he announced that a product launch was imminent.

Mr. Batio's argument also misconstrues the nature of the charges in the indictment. The Government charged not that Mr. Batio's updates caused Armada investors to give him money in the first place, but that he repeatedly persuaded prior investors to give him even more money. (*See generally* Superseding Indictment.) Counts I–V and VII concern mailings that were sent to or received by Armada investors in late 2011. All four victims named in these counts had already invested, but they were moved to invest again after some form of communication from Mr. Batio. To take just one example, Armada investor Susan Sklade invested $2,500 (on top of the $39,000 that she had already invested since 2006) after a telephone conversation with Jeff Batio in August

---

[16]    *See also id.* at *6 ("Viewing the evidence in the light most favorable to the Government, there is simply no evidence in the record that, in the context of an arms-length transaction in which the parties bluffed and 'BS-[ed]' each other, operated as principals, looked out for their own interests, and understood the other party to be 'posturing,' rather than providing strictly true information, someone in [the financial institution's] position could, objectively, be induced by the statements in this case to part with money or property.").

of 2011. (*See* Tr. 367:22–368:2, 380:19–383 (Susan Sklade direct examination).) Counts VI and VIII concern wire transfers on September 23, 2011 and July 24, 2012, respectively, for the purpose of fundraising for Armada. In the "Investor Update" email described in Count VIII, Mr. Batio announced that "We are launching the Ideal Future [IF] Convertible in 60 days." (Tr. 877:8–9 (Gregory Cazel direct examination).) But according to investor Cartic Vengkatrama, who Mr. Batio asked to advise him on the IF Convertible's development, "there was no product" in 2012, and the device (later renamed the Dragonfly) was not ready for crowdfunding. (Tr. 240:13–241:8.) Again, the email need not have actually induced investment in Mr. Batio's companies so long as his misrepresentations were capable of inducing investors to part with their money.

Mr. Batio's false statements not only reassured existing investors, but also encouraged new investment. Counts IX–XII concern wire transfers from Indiegogo contributors between October and November 2014. These transfers followed the start of Mr. Batio's second crowdfunding campaign, which began on October 1, 2014. (Tr. 27: 3–6 (stipulation).) Here, the Government did not have to prove that the contributors named in the indictment relied upon Mr. Batio's subsequent misrepresentations, such as the October 2015 video at Mr. Villa's prototyping facility. Rather, the Government had to show that the Indiegogo campaign involved a series of materially deceptive representations designed to obtain money from contributors. By the summer of 2016, Mr. Batio had still not determined how the device would run on both Windows and Android, he had not located a manufacturer with the ability to include a cell phone, and he could not deliver a product as thin as a dime when folded. Yet those are all promises that he made to Indiegogo contributors as early as October 2014.

Viewing the evidence in the light most favorable to the Government, a reasonable jury could find that the prosecution had carried its burden of proving every element of mail and wire fraud beyond a reasonable doubt.

16

C.      **Constitutional Arguments**

Mr. Batio next argues that he was denied his constitutional rights to due process and a fair trial because the jury returned a verdict fairly quickly. While Mr. Batio contends that the jury deliberated for merely half an hour (Def.'s Reply at 28), the Government responds that it was closer to two hours between the time the jury began deliberating and when they delivered the verdict. (Gov't's Sur-reply at 16.) In any event, the Seventh Circuit has determined that the length of deliberations is an insufficient ground to establish denial of due process. "At best," brief deliberations are "a factor to be considered when deciding a motion for a new trial, and even then cannot be the only basis for granting a new trial." *United States v. Cunningham*, 108 F.3d 120, 124 (7th Cir. 1997) (citations omitted). Other circuits have reached the same conclusion. *See, e.g.*, *United States v. Burfoot*, 899 F.3d 326, 342 (4th Cir. 2018) (collecting cases) ("[J]uries are presumed to follow the judge's instructions, including the instruction to fully deliberate. . . . And the mere length of a jury's deliberation doesn't refute that presumption.").

Defense counsel correctly notes that the court itself anticipated the jury would continue deliberations on the following business day after closing arguments.[17] (Def.'s Reply at 29.) But speculation about the time it would take to return a verdict does not indicate that the actual length of the jury deliberations was so brief as to deny Mr. Batio his constitutional rights. Mr. Batio also argues that the jury's request for the summary of charges chart that the Government used during its closing argument indicates that they were "looking for an easy way out of proper deliberation." (Def.'s Reply at 28; *see* Tr. 1696:6–1698:14.) The jury's request may instead have reflected the opposite: that they wanted to carefully review the evidence, charge by charge. Regardless, the court sustained the defense objection at the time the request was made and declined to provide

---

[17]      *See* Def.'s Reply at 29 (citing Tr. 1694: 1–4 (The Court: "I let [the jury] go as late as they want, but I am morally certain they're out of here within an hour or so. That would be my guess. I've been predicting all along they'll come back on Monday.")).

the jury with the chart, which was merely a demonstrative exhibit. (*See* Tr. 1698:15–18.) The jury then continued deliberating.[18] In the absence of any additional evidence that the jury failed to properly deliberate, the court concludes that there was no trial error depriving Mr. Batio of any substantial rights. *See United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004).

## D. Government Misconduct

Mr. Batio argues that he should be acquitted or granted a new trial because there was significant government misconduct. (Def.'s Reply at 20–28; *see also* Jeffrey Batio's Ex. of Gov't Prosecutorial Misconduct, Ex. 1 to Def.'s Reply [300-1].) He believes that the Government "create[d] an environment in which criminal charges are brought for what is essentially a civil matter" and "criminalized lawful aspects of startup culture." (Def.'s Reply at 20.)

The Seventh Circuit has repeatedly declined to recognize a defense to a criminal conviction on the basis of "outrageous government conduct." *United States v. Smith*, 792 F.3d 760, 765 & n.27 (7th Cir. 2015) (collecting cases). Such conduct cannot be an independent basis for a new trial. *Id.* (citing *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) ("The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted.")).

Here, Mr. Batio has not alleged specific acts of government misconduct. Instead, his consolidated motion primarily reiterates his argument that he intended to bring his products to market in good faith. (Def.'s Reply at 21–26.) His most concrete allegation is that "the Government repeatedly took [his] written updates entirely out of context by failing to provide his follow-on statements that provided the necessary context." (Def.'s Reply at 26.) But this

---

[18]     *See* Tr. 1698:25 ("Recess at 4:59 p.m., until 6:22 p.m.").

allegation, even if true, does not amount to prosecutorial misconduct; defense counsel could have rectified any mischaracterization by pointing out such omissions at trial.[19]

Mr. Batio also suggests that the decision to indict him in June of 2016 is itself evidence of misconduct because it halted his efforts to produce the Dragonfly. (Def.'s Reply at 28.) But the Government's decision to indict him, as an exercise of prosecutorial discretion, is not misconduct. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[T]he decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [a prosecutor's] discretion."). And there is substantial evidence that Mr. Batio would not have been able to manufacture the Dragonfly with Benchmark even if he had not been indicted. (*See* Tr. 700:2–702:2 (Mitch Gebheim direct examination) (testifying that Benchmark never actually signed a manufacturing contract with Mr. Batio, that Benchmark would not have been able to make the Dragonfly with a cell phone, and that the project ran out of funding in July of 2016).)

After a careful review of the record and the arguments in Mr. Batio's *pro se* letter, the court concludes that there is no evidence of prosecutorial misconduct that would justify a new trial.

**E.    Ineffective Assistance of Counsel**

Finally, Mr. Batio contends that his counsel prior to and at trial was so deficient as to violate his Sixth Amendment right to counsel. (Def.'s Reply at 29.) It is unusual for defendants to raise ineffective assistance arguments in post-trial motions. *See United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991) (noting that a defendant may "ask the district judge for a new trial on the basis either of what the trial record discloses about his lawyer's performance or of extrinsic evidence"). The Seventh Circuit counsels against making such claims on direct appeal. *See United States v. Cates*, 950 F.3d 453, 456 (7th Cir. 2020) ("Raising an ineffective-assistance claim on direct appeal

---

[19]    Indeed, Mr. Batio argues that his trial attorney, Andrea Gambino, provided ineffective assistance of counsel by failing to provide "direct exculpatory evidence in the form of written follow-on statements Batio had made at the time" to refute what he contends were Government mischaracterizations. (Def.'s Reply at 34.) For the reasons discussed in Part D, however, this purported failure does not constitute ineffective assistance.

is almost always imprudent.") Unless a record of allegedly ineffective assistance was developed in the trial court, "[e]ssential evidence of counsel's actions and reasoning will simply be lacking," so defendants are ordinarily better served by waiting to develop a full record on collateral attack under 28 U.S.C. § 2255. *Id.* at 457. Nonetheless, because Mr. Batio has retained new counsel and is raising ineffective assistance as part of his motion for a new trial, the court may properly address these arguments now. *See Taglia*, 922 F.2d at 417–18 (noting that a defendant may "ask the district judge for a new trial on the ground that the trial record [alone] shows a denial of effective assistance, . . . [but] every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight").

To make out an ineffective assistance of counsel claim, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* (citation omitted). This objective standard considers the totality of the circumstances, but "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Hence, the bar for establishing ineffective assistance of counsel is quite high. *See Jordan v. Hepp*, 831 F.3d 837, 846 (7th Cir. 2016). Furthermore, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To establish prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Mr. Batio argues that his trial counsel, Andrea Gambino, "was perpetually unprepared and unwilling to provide for [his] defense, and her ineffective assistance left [him] virtually defenseless." (Def.'s Reply at 36.) He claims that Ms. Gambino did not make herself available for trial preparations with him and, as a result, they were not on the same page about his defense

strategy.  (Def.'s Reply at 32, 34.)  He also complains that Ms. Gambino decided to call Mr. Braver as a summary witness rather than an expert witness (Def.'s Reply at 30–31), that she did not interview witnesses Mr. Batio had identified as critical to his defense (Def.'s Reply at 32), and that she did not call FBI Agent Gregory LaBerta to testify, even though he had testified before both grand juries.  (Def.'s Reply at 33.)  Finally, Mr. Batio claims that he wanted to testify, but Ms. Gambino did not help him prepare despite his requests.  (Def.'s Reply at 35.)

Mr. Batio also makes complaints against Attorney Lisa Wood, a Federal Defender panel attorney who represented him pre-trial.  (*See generally* Tr. of Hr'g on Mot. for Leave to Withdraw [234]; Tr. of Status Conference [236] (Dec. 21, 2018) (granting motion to substitute counsel).) Specifically, he argues that Ms. Wood failed to tender data to Ms. Gambino in a timely fashion, who was therefore delayed in passing it along to intended witness Ronald Braver.  (Def.'s Reply at 30.)  Mr. Batio believes that Ms. Wood's decision to call Mr. Braver as a summary witness rather than expert witness—a decision that Ms. Gambino later adopted—was outside the bounds of professionally competent assistance and prejudiced him because Mr. Braver was unable to testify as an expert.  (Def.'s Reply at 30–31.)

After reviewing the record, the court concludes that Ms. Wood and Ms. Gambino provided reasonably effective assistance.  It is simply not true that Ms. Gambino "did not prepare with [Mr. Batio], interview *any* witnesses, or consider or present *any* evidence."  (Def.'s Reply at 36 (emphases in original).)  She devoted substantial attention to Mr. Braver's proposed testimony. Ms. Gambino called Robert Sherwood, who testified about startup culture in general and "tech startups" in particular.  (*See* Tr. 1503–1573 (Mr. Sherwood direct, cross, and redirect examination).)  This testimony was evidence that the jury could have considered during its deliberations.  The fact that Ms. Gambino did not introduce exhibits along with Mr. Sherwood's testimony speaks more to his lack of personal knowledge regarding Mr. Batio's businesses than to Ms. Gambino's failure to mount a defense.

21

Mr. Batio also cannot reasonably claim that Ms. Gambino prevented him from testifying. This Court admonished him numerous times to ensure that his waiver of his right to testify was knowing and voluntary. (*See* Tr. 1386:24–1387:20 (explaining the Defendant's Fifth Amendment right to testify); Tr. 1574:3–8 (reminding the Defendant of his right to take the stand).) Mr. Batio ultimately decided not to testify. (Tr. 1574:12.) There is no basis here for the conclusion that this decision was not knowing and voluntary.

Mr. Batio's remaining complaints against Ms. Gambino and Ms. Wood boil down to disagreements over trial strategy. When assessing the effectiveness of counsel, "courts must defer to any strategic decision the lawyer made that falls within the 'wide range of reasonable professional assistance,' even if that strategy was ultimately unsuccessful." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic," and counsel's decision "to call or not to call a witness is generally not subject to review." *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013) (citation and quotation marks omitted).

The record does not provide definitive explanations for some of Ms. Wood and Ms. Gambino's strategic decisions, such as Ms. Gambino's decision not to call members of the Armada Advisory Board as witnesses. But Mr. Batio has not requested an evidentiary hearing that might add substance to his ineffective assistance of counsel claims, and "if there is no reason to suppose that a hearing would produce evidence justifying the grant of a new trial, there is no reason to hold a hearing." *United States v. Taglia*, 922 F.2d 413, 419 (7th Cir. 1991). Mr. Batio did attach a letter from one Armada Advisory Board member, Douglas Fitz, who reported that he had "frequent contact" with Mr. Batio; had visited the production facility, which Mr. Fitz believed was "well equipped"; did not "witness or suspect fraud"; and does not believe "society will be better served" by Mr. Batio's facing a criminal conviction. (*See* Letter from Douglas Fitz to the Court of 12/19/19, Attachment 4-A to Def.'s Reply). Notably, Mr. Fitz also stated that he is "not familiar with the preparations for production of the mobile device involved in the Indiegogo campaign."

(*Id.*) There is little likelihood that such testimony, had it been presented, would have resulted in a different outcome. The court concludes that an evidentiary hearing on this and other ineffective assistance claims is unnecessary.

Even if any of their alleged missteps amounted to ineffective assistance, Mr. Batio has failed to demonstrate that counsel's errors were prejudicial. In particular, he has not demonstrated a reasonable probability that Mr. Braver's testimony, had it been admitted, would have led to a different outcome at trial. Mr. Braver was prepared to testify that $4.5 million of Mr. Batio's expenses between 2004 and 2016 were business-related. (*See* Ronald Braver Findings, Attachment 2 to Def.'s Reply, at 4.) At first glance, that testimony might have helped Mr. Batio's case, but before Mr. Braver was called to testify, it became clear that there was no foundation for his conclusions as to which amounts were personal expenses and which were business expenses. (*See* Tr. 1393:13–1395:19.) The court directed that Mr. Braver testify only after editing the charts he planned to present so that they stopped short of classifying certain payments as business expenses. (Tr. 1404:1–25; Tr. 1406:16–1407:9). Contrary to Mr. Batio's assertions (Def.'s Reply at 31), Ms. Gambino did not ignore the court's suggestion that Mr. Braver reframe his data. Rather, Ms. Gambino made the decision not to call Mr. Braver because he would not have been able to reconfigure his charts in time for trial. (*See* Tr. 1499:12–13.) Without such modifications, those charts were inadmissible because they presented summaries of expenses based only on Mr. Braver's conversations with Mr. Batio. (*See* Tr. 1419:10–1421:9; Tr. 1429:15–1431:12.) In other words, Mr. Braver's opinions about the bona fides of Mr. Batio's use of his investment funds rested on Mr. Batio's own statements. Mr. Batio himself either failed to keep supporting documentation of his expenses or, if he did so, failed to turn them over to the Government, so the financial records were not in evidence. (*See* Tr. 1475:14–17.) Thus, because there was no foundation for Mr. Braver's conclusions without Mr. Batio's own testimony (*see* Tr. 1459:19–1460:6), Ms. Gambino's strategic decision not to call Mr. Braver was eminently reasonable and not prejudicial.

Finally, Mr. Batio contends that his trial counsel was ineffective in failing to file requests for exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he argues that "[t]he Government withheld a significant amount of exonerating evidence" at the grand jury stage by not showing the grand jury his prototypes and other evidence indicating that he was working to develop his products. (Def.'s Reply at 35 & n.31.) This argument has no purchase at this stage of the proceedings: post-trial, the question is not whether the grand jury had probable cause to indict him, but whether a reasonable jury could find that the Government's evidence *at trial* established the elements of mail and wire fraud beyond a reasonable doubt. Some of Mr. Batio's prototypes were in evidence at trial, yet the jury seems to have been persuaded by the Government's characterization of them as inculpatory, rather than exculpatory. Moreover, Mr. Batio's suggestion that "withholding" such evidence violates *Brady* is mistaken. (Def.'s Reply at 35.) Mr. Batio was already in possession of prototypes and other evidence that he believed would exonerate him, so the Government had no obligation to turn over such evidence for his defense. *See United States v. Lawson*, 810 F.3d 1032, 1043 (7th Cir. 2016) (noting that evidence is not "suppressed" within the meaning of *Brady* if it was "available to the defendant through the exercise of reasonable diligence") (citations omitted). Trial counsel was not ineffective for failing to request access to Defendant's own evidence at trial.

## CONCLUSION

For the reasons stated above, the motion for a judgment of acquittal or a new trial is denied.

ENTER:

Date: December 15, 2020

REBECCA R. PALLMEYER
United States District Judge